871 F.2d 1548
 29 ERC 1876, 19 Envtl. L. Rep. 20,956
 STATE OF ALABAMA, etc., et al., Plaintiffs-Appellees, Cross-Appellants,
v.
The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; and Lee
M. Thomas, Defendants-Appellants,
State of Texas; and Chemical Waste Management, Inc.,
Intervenors-Appellants, Cross-Appellees.
STATE OF ALABAMA, ex rel. Don SIEGELMAN, Attorney General,
and Guy Hunt, Don Siegelman and Leigh Peques,
individually as citizens of the State of
Alabama, Plaintiffs-Appellees,
Cross-Appellants,
v.
The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Lee M.
Thomas, Administrator of the United States
Environmental Protection Agency,
Defendants-Appellants, Cross-Appellees,
Chemical Waste Management, Inc., State of Texas,
Intervenors-Appellants, Cross-Appellees.
 Nos. 88-7677, 89-7024.
 United States Court of Appeals, Eleventh Circuit.
 April 18, 1989.
 
 John P. Scott, Jr., Marshall Timberlake, Balch & Bingham, Birmingham, Ala., R. Craig Kneisel, Office of the Atty. Gen., Robert D. Tambling, Asst. Atty. Gen., Montgomery, Ala., for State of Ala., Guy Hunt, Don Siegleman & Leigh Pegues.
 James Eldon Wilson, U.S. Atty., Montgomery, Ala., for E.P.A.
 Maynard, Cooper, Frierson & Gale, P.C., Fournier J. Gale, III, H. Thomas Wells, Jr., Alfred F. Smith, Jr., Birmingham, Ala., for Chemical Waste Management.
 John R. Carter, Environmental Protection Division, Austin, Tex., for State of Texas.
 David C. Shilton, U.S. Dept. of Justice, Appellate Section, Washington, D.C., for intervenors-appellants, cross-appellees.
 Appeals from the United States District Court for the Middle District of Alabama.
 Before JOHNSON, HATCHETT and COX, Circuit Judges.
 JOHNSON, Circuit Judge:
 
 
 1
 This appeal arises from the issuance of a temporary injunction preventing the shipment of soil contaminated with PCBs and other toxic wastes from the Geneva Industries, Inc., toxic waste site in South Houston, Texas, to Chemical Waste Management (CWM)'s toxic waste treatment facility in Emelle, Alabama. The State of Alabama and its governor, attorney general, and head of the department of environmental management, acting in their capacities as private citizens, filed suit in federal district court seeking to enjoin shipment of these wastes. Plaintiffs asserted both constitutional claims and claims based on the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C.A. Sec. 9601 et seq. (CERCLA).
 
 
 2
 The district court issued a preliminary injunction halting EPA's participation in the remedial action selected to clean up the Geneva Industries site, and the EPA, along with intervenors State of Texas and CWM, appealed. During the pendency of the appeal, the district court granted partial summary judgment to plaintiffs enjoining the EPA from implementing its remedial action plan to clean up the Geneva Industries site until plaintiffs have had the opportunity to comment on the remedial action plan. This Court granted defendants' motion to consolidate the appeal from the preliminary injunction with the appeal from the grant of summary judgment. We reverse the grant of preliminary injunction, reverse the grant of summary judgment, dissolve the permanent injunction, and dismiss this case for lack of subject matter jurisdiction.
 
 I. FACTS
 
 3
 In 1983, Texas submitted the site of Geneva Industries, Inc.'s former petrochemical plant in South Houston, Texas, to be included on the National Priorities List for cleanup by the EPA pursuant to CERCLA. The site is contaminated with polychlorinated biphenyls (PCBs) and other toxic chemicals. The EPA placed this site on the National Priorities List, where it ranked number 37 out of over 700 sites listed. In 1983 and 1984, EPA conducted a planned removal[1] to stabilize the site and to reduce the immediate health and safety risks of the contamination to residents in the area.
 
 
 4
 In 1984, the Texas Department of Water Resources, the state agency operating in cooperation with the EPA to clean up the site, contracted for a Remedial Investigation and Feasibility Study. This is a preliminary step in cleaning up a hazardous waste site under CERCLA. The contractor evaluated alternative remedial action plans and presented them to the state. In 1986, the Feasibility Study describing the alternatives was released for public comment and review. A public meeting was held in May 1986, and the public comment period was held open until June 10, 1986. On September 18, 1986, the Regional Director of the EPA issued the Record of Decision memorializing the alternative chosen to clean up the Geneva Industries site. The EPA selected offsite disposal of the hazardous wastes. At the time, there were only a limited number of treatment facilities in the United States capable of handling these toxic wastes. Among those facilities was CWM's hazardous waste treatment facility in Emelle, Alabama.
 
 
 5
 There are two separate federal statutes regulating the Emelle, Alabama, facility. The Toxic Substances Control Act, 15 U.S.C.A. Sec. 2601 et seq. (TSCA), regulates the handling, storage, and disposal of wastes contaminated with PCBs. The Resource Conservation and Recovery Act, 42 U.S.C.A. Sec. 6901 et seq. (RCRA), regulates other hazardous wastes. CWM's Emelle, Alabama, facility is licensed under both federal statutes and under complementary state regulations[2] to handle the wastes located at the Geneva Industries toxic waste site. The TSCA and the RCRA ensure that CWM's toxic waste storage and treatment facility poses the least possible risk to human health and safety.
 
 
 6
 The TSCA establishes a regulatory framework for the safe handling and disposal of certain highly toxic wastes. Regulations adopted pursuant to the TSCA control the storage and disposal of PCBs. See 40 C.F.R. Sec. 761.75(b)(8). The regulations establish very specific soil, hydrological, geological, and topographical requirements for facilities that dispose of wastes contaminated with PCBs. 40 C.F.R. Sec. 761.75(b)(1), (2), (3), (4), and (5). The regulations also provide for monitoring the groundwater in the vicinity of the chemical waste landfill. 40 C.F.R. Sec. 761.75(b)(6). The permit application process ensures that licensed treatment facilities comply with these requirements. 40 C.F.R. Sec. 761.75(c)(3).
 
 
 7
 The RCRA establishes a framework for regulating the storage and disposal of hazardous wastes in general. Operators of hazardous waste treatment, storage, and disposal facilities must comply with detailed operating regulations. 42 U.S.C.A. Sec. 6924; see generally 40 C.F.R. Part 264. This includes stringent permit application requirements and regulations. See 42 U.S.C.A. Sec. 6925; see generally 40 C.F.R. Part 270. The regulations promulgated pursuant to the RCRA ensure that facilities disposing of hazardous wastes do so in a manner consistent with eliminating health and environmental risks caused by the hazardous wastes. A permit is valid only for a maximum term of ten years, 40 C.F.R. Sec. 270.50(a), and each permit for a land disposal facility is reviewed after five years and is subject to modification at that point. 40 C.F.R. Sec. 270.50(d). A permit may be terminated for noncompliance with any of its conditions, 40 C.F.R. Sec. 270.43(a)(1), for failure to disclose material information or misrepresentation of material facts, 40 C.F.R. Sec. 270.43(a)(2), or if the activity "endangers human health or environment" and can be regulated only through modification or termination of the permit. 40 C.F.R. Sec. 270.43(a)(3).
 
 
 8
 CWM's Emelle, Alabama, hazardous waste treatment facility received permits under both the TSCA and the RCRA. This facility thus has complied with elaborate federal regulations designed to ensure the safe disposal of hazardous wastes, including wastes contaminated with PCBs. To the extent these federal regulations can and do provide for the safe treatment and disposal of toxic wastes, CWM's Emelle, Alabama, facility poses no threat to the health and safety of the residents of Emelle or to other Alabama residents. This applies to the material shipped from South Houston, Texas, as well as to the material the facility has handled from Tennessee and from locations within the State of Alabama.
 
 
 9
 The State and citizens of Alabama participated throughout the process by which CWM received permits to handle hazardous wastes at its Emelle facility. At the time of the original application in May 1978, the State of Alabama strongly supported the grant of the permits. The facility began operating under interim status authorization in November 1980. See 42 U.S.C.A. Sec. 6925(e). In December 1984, EPA, CWM, and the state entered into a Consent Agreement authorizing the facility to handle PCBs. In 1985, citizens of the State of Alabama received notice of the proposed licensing of the Emelle facility for disposal of PCBs under the TSCA. EPA provided twice the period for public comment normally accorded such decisions, held a public information session lasting 7- 1/2 hours in Livingston, Alabama, and held an open public meeting. EPA received 78 oral and 145 written comments on the proposed permit, and responded in detail to each comment. The PCB disposal permit was challenged unsuccessfully in federal court under the Administrative Procedure Act. After response in an acceptable manner to all challenges, the final permit became effective July 11, 1988.
 
 
 10
 CWM received the contract to dispose of the Geneva Industries site wastes pursuant to a closed bidding contractor selection process. In January 1988, the Texas Water Commission, successor to the Texas Department of Water Resources, solicited sealed bids from contractors for the various projects called for in the Record of Decision. In response, CWM offered the lowest bid for disposal of the contaminated soil, and received the contract on April 8, 1988. The EPA did not select CWM's Emelle, Alabama, toxic waste treatment facility in the Record of Decision for cleanup of the Geneva Industries site. In the Record of Decision, the EPA decided only that offsite disposal was the best way to clean up the Geneva Industries site. The EPA made this decision in September 1986. The sealed bid solicitation process followed, and EPA granted CWM the contract to dispose of the wastes in April 1988.
 
 
 11
 In June 1988, Alabama legislators, including Governor Hunt and Attorney General Siegelman, learned of the proposed shipment of toxic wastes from Texas to Alabama. On June 22, 1988, Governor Hunt wrote to the Administrator of the EPA requesting a delay in the shipment. On June 23, 1988, Attorney General Siegelman wrote to the Administrator requesting information about the nature of the Geneva Industries site toxic wastes. The EPA delayed the shipment to respond to the letters in detail. EPA officials also met with Alabama Congressmen and state legislators to address their concerns. After considering the concerns expressed by the State of Alabama, the EPA decided to follow the original remedial action plan set out in the Record of Decision.
 
 
 12
 Shortly thereafter, the State of Alabama and three individual citizens of Alabama, Governor Hunt, State Attorney General Siegelman, and Leigh Pegues, head of the state department of environmental management, filed suit against the EPA seeking to enjoin shipment of the hazardous wastes from Texas to Alabama. The district court granted a preliminary injunction enjoining the EPA and its administrator and employees from executing the Geneva Industries site remedial action plan, from funding the remedial action, or from approving or otherwise facilitating the transportation of hazardous wastes from Texas to Alabama. CWM and the State of Texas intervened, and, along with the EPA, appeal the grant of this preliminary injunction. Prior to our consideration of this appeal, the district court granted partial summary judgment to the plaintiffs, ordered EPA to reopen its Record of Decision for the Geneva Industries site, and dismissed the remainder of the case. Defendants appealed. We consolidated the appeals and address both in this decision.
 
 II. DISCUSSION
 
 13
 The district court had jurisdiction to grant summary judgment and to dismiss the suit despite the pending interlocutory appeal. Cf. United States v. White, 846 F.2d 678, 693 n. 23 (11th Cir.1988). However, that decision did not divest this Court of its jurisdiction over the interlocutory appeal of the preliminary injunction. See generally Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) (per curiam). Although the injunction itself did not survive the grant of summary judgment and dismissal, Cypress Barn, Inc. v. Western Electric, 812 F.2d 1363 (11th Cir.1987), we still have jurisdiction over this appeal. Cf. University of Texas v. Camenisch, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (fact that preliminary injunction itself is moot does not moot appeal from grant of preliminary injunction). In addition, although no final judgment has been entered pursuant to Fed.R.Civ.P. 54(b), we have jurisdiction over the appeal from the grant of summary judgment because the district court granted a mandatory permanent injunction compelling EPA to reopen its Record of Decision. See 28 U.S.C.A. Sec. 1291.
 
 
 14
 Plaintiffs challenge the EPA's failure to provide them with notice and a hearing before choosing the appropriate remedial action for the Geneva Industries toxic waste site in South Houston, Texas. These claims have two bases, the first constitutional and the second statutory. Plaintiffs argue that the EPA could not implement this remedial action plan without providing them with notice and an opportunity for a hearing without violating the due process clause of the fifth amendment. The State of Alabama argues it is an "affected state" within the meaning of 42 U.S.C.A. Sec. 9604(c)(2), and thus was entitled to notice and an opportunity to participate in the choice of offsite disposal as the appropriate remedial action for the Geneva Industries toxic waste site. The individual plaintiffs assert they were entitled to notice and an opportunity to participate pursuant to 42 U.S.C.A. Sec. 9613(k)(2)(B). Finally, all plaintiffs argue EPA failed to comply with the publication requirements of 42 U.S.C.A. Sec. 9617. Plaintiffs base jurisdiction on four separate provisions: 28 U.S.C.A. Sec. 1331, which gives federal courts jurisdiction over claims arising under the Constitution; 42 U.S.C.A. Sec. 9613(b), which gives federal courts jurisdiction over challenges to actions taken pursuant to CERCLA; 42 U.S.C.A. Sec. 9659(a), which gives persons authority to challenge remedial actions selected under CERCLA; and 5 U.S.C.A. Sec. 702, which gives federal courts jurisdiction over challenges to administrative agency actions. We address each of these claims in turn.
 
 A. Constitutional Claims
 
 15
 Plaintiffs assert that the denial of notice and opportunity for a hearing before implementation of the remedial action plan violates their due process rights under the fifth amendment. Standing is a jurisdictional prerequisite to suit in federal court. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 475-76, 102 S.Ct. 752, 760-61, 70 L.Ed.2d 700 (1982). The State of Alabama is not included among the entities protected by the due process clause of the fifth amendment, South Carolina v. Katzenbach, 383 U.S. 301, 323, 86 S.Ct. 803, 816, 15 L.Ed.2d 769 (1966), and lacks standing to claim that the EPA was constitutionally compelled to provide it with notice and an opportunity to be heard. See generally Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 218-19, 94 S.Ct. 2925, 2930-31, 41 L.Ed.2d 706 (1974) (plaintiff must assert legally cognizable injury in fact, whether real or threatened, before federal courts have jurisdiction). The individual plaintiffs also fail to satisfy the standing requirements necessary for the exercise of federal jurisdiction over their constitutional claims.
 
 
 16
 Standing involves two aspects. The first is the minimum "case or controversy" requirement of Article III. That requirement mandates that the plaintiff himself or herself suffer actual or threatened injury, resulting from the action challenged, that is likely to be redressable in a judicial action. Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). In addition, the Supreme Court has established several requirements based on prudential considerations. A litigant generally may not assert the rights of another person, Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984), or present generalized grievances about the conduct of government which are more appropriately addressed in the representative branches, United States v. Richardson, 418 U.S. 166, 174-75, 94 S.Ct. 2940, 2945-46, 41 L.Ed.2d 678 (1974), and the litigant's complaint must fall within the "zone of interests" protected by the law invoked. Association of Data Processing Serv. Org., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970).
 
 
 17
 Plaintiffs allege two types of real or threatened injury caused by defendants' actions.[3] First, plaintiffs argue that shipment of these toxic wastes will cause increased expenditures of tax revenues through increased costs of highway maintenance and environmental safety measures. Plaintiffs base standing on their status as taxpayers. This does not satisfy the minimum constitutional requirement of injury in fact necessary for the exercise of federal jurisdiction. See generally Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979) (plaintiff must allege "he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant"). Although an injury need only be "trifling," it must nevertheless be a real or threatened injury suffered by one of the plaintiffs. See Schlesinger, 418 U.S. at 220-21, 94 S.Ct. at 2931-32 ("Concrete injury, whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution."). In certain limited circumstances, where an expenditure itself would violate an express constitutional provision, a taxpayer may have standing to challenge the expenditure. See Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (taxpayer could challenge expenditure that violated establishment clause). Otherwise, however, plaintiffs as taxpayers do not have standing to challenge governmental action. See, e.g., Valley Forge, 454 U.S. at 476-82, 102 S.Ct. at 760-64 (taxpayers lacked standing to challenge government transfer of property to religious organization on establishment clause grounds); Schlesinger, 418 U.S. at 222, 94 S.Ct. at 2932-33 (citizens as taxpayers have no standing to compel governmental compliance with federal statute). In this case, plaintiffs do not allege that the increased expenditure of state funds, if it occurs, would violate any constitutional provision. Thus, plaintiffs lack standing to challenge this action based on their status as taxpayers alone.
 
 
 18
 Second, plaintiffs allege injury based on the threat to the environmental quality of the State of Alabama. This claim alleges the requisite injury in fact for the federal court to exercise subject matter jurisdiction. See generally Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (whale watching group has standing to challenge failure of Secretary of Commerce to cite Japan for overharvesting whales); United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (potential adverse environmental impact of railroad rate change sufficient); cf. Callaway v. Block, 763 F.2d 1283 (11th Cir.1985) (peanut farmers had standing to appeal denial of injunction against Secretary of Agriculture preventing implementation of new regulations). There must also be a connection between the injury alleged and the challenged action, however. Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976) (injury must be able to be traced to the challenged action). Generalized grievances about the conduct of government are insufficient. See United States v. Richardson, 418 U.S. 166, 175, 94 S.Ct. 2940, 2945-46, 41 L.Ed.2d 678 (1974). The injury must be a consequence of the challenged action. See Valley Forge, 454 U.S. at 473, 102 S.Ct. at 759 ("The exercise of judicial power ... is therefore restricted to litigants who can show 'injury in fact' resulting from the action which they seek to have the court adjudicate.") (emphasis added).
 
 
 19
 In this case, there is no necessary causal connection between the injury to Alabama's environment and the lack of notice and opportunity to participate in the selection of the remedial action for the Geneva Industries site. Plaintiffs do not challenge the shipment of wastes from Texas to Alabama directly. To the extent the injury alleged may result from the operation of CWM's Emelle, Alabama, facility, plaintiffs do not challenge the permits that allow CWM to receive PCBs.[4] Rather, plaintiffs seek only a hearing in which to express their views about the appropriate remedial action for this site. The threat to Alabama's environment, however, results solely from the actual shipment and receipt of the wastes. Plaintiffs' injury thus does not result from their lack of participation in the development of the Record of Decision. Plaintiffs' injury also is not likely to be redressed by a reopening of the Record of Decision. Because they have failed to allege "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief," Allen v. Wright, 468 U.S. at 751, 104 S.Ct. at 3324, the individual plaintiffs lack standing to challenge this shipment under the fifth amendment.
 
 
 20
 Plaintiffs argue that this is their only chance to challenge this decision. Even assuming this assertion is true, "[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." Schlesinger, 418 U.S. at 227, 94 S.Ct. at 2935. Plaintiffs simply are not entitled to raise these constitutional claims. Consequently, the constitutional claims raised by the plaintiffs must be dismissed for lack of standing.
 
 B. Statutory Claims
 
 21
 Alabama argues that it is an "affected state" within the meaning of 42 U.S.C.A. Sec. 9604(c)(2), and that it was entitled to receive notice and an opportunity for a hearing before final selection of the remedial action plan.[5] The individual plaintiffs assert that they were entitled to notice and an opportunity to comment on the remedial action plan prior to implementation under 42 U.S.C.A. Sec. 9613(k)(2)(B). Plaintiffs also assert EPA failed to publish the Record of Decision according to the requirements of 42 U.S.C.A. Sec. 9617. Plaintiffs assert they have the authority to bring this action to compel compliance with the provisions of CERCLA under section 310(a), 42 U.S.C.A. Sec. 9659(a). That section allows any person to commence a civil action against the EPA to compel compliance with CERCLA's provisions. See 42 U.S.C.A. Sec. 9659(a)(2). "Person" includes the State of Alabama. 42 U.S.C.A. Sec. 9601(21).
 
 
 22
 Plaintiffs base federal jurisdiction over their statutory claims on two provisions. First, plaintiffs assert that the 1986 amendments to CERCLA grant federal courts jurisdiction over this action. Plaintiffs rely on section 113(b), 42 U.S.C.A. Sec. 9613(b), which grants federal courts exclusive original jurisdiction over controversies arising under CERCLA, and section 310(a), 42 U.S.C.A. Sec. 9659(a), the general citizen suit enforcement provision. Second, plaintiffs base federal jurisdiction on the Administrative Procedure Act, 5 U.S.C.A. Sec. 701 et seq. (APA). The APA provides, "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C.A. Sec. 702. We review jurisdiction under CERCLA and under the APA separately.
 
 1. CERCLA
 
 23
 Plaintiffs argue that the district court has jurisdiction over these claims under section 113(b) of CERCLA, 42 U.S.C.A. Sec. 9613(b). Section 113(b) provides: "Except as provided in subsections (a) and (h) of this section, the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter, without regard to the citizenship of the parties or the amount in controversy." Defendants argue that section 113(h), 42 U.S.C.A. Sec. 9613(h), removes these challenges from federal jurisdiction.[6] Defendants argue that section 113(b) grants jurisdiction to the federal courts over controversies arising under CERCLA; that section 113(h) removes from federal jurisdiction challenges to remedial actions selected under section 104, 42 U.S.C.A. Sec. 9604; and that section 113(h)(4) then restores federal jurisdiction over suits brought under section 310 once the remedial actions are taken under section 104 or secured under section 106. Defendants argue that under section 113(h)(4), no action may be brought under section 310(a) until the remedial action is actually taken.[7] We agree.
 
 
 24
 Section 113(h) clearly removes this challenge from federal jurisdiction, providing: "No Federal court shall have jurisdiction under Federal law ... to review any challenges to removal or remedial action [sic] selected" except as section 113(h)(1)-(4) provides. Section 113(h)(4) in general addresses the timing of judicial review of EPA cleanup efforts. The plain language of the statute indicates that section 113(h)(4) applies only after a remedial action is actually completed. The section refers in the past tense to remedial actions taken under section 104 or secured under 106. Absent clear legislative intent to the contrary, this language is conclusive. See Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).
 
 
 25
 The legislative history behind this section supports rather than clearly contradicts this conclusion. Judicial review is to be delayed until "all the activities set forth in the Record of Decision for the surface cleanup phase have been completed." H.Conf.Rep. No. 962, 99th Cong., 2d Sess. 224, reprinted in 1986 U.S.Code Cong. & Admin.News 2835, 3317. See, e.g., H.R.Rep. No. 253(I), 99th Cong., 2d Sess. 81, reprinted in 1986 U.S.Code Cong. & Admin.News 2863 ("The section is intended to codify the current position of the Administrator and the Department of Justice with respect to preenforcement review: there is no right of judicial review of the Administrator's selection and implementation of response actions until after the response action [sic] have been completed...."); H.R.Rep. No. 253 (III), 99th Cong., 2d Sess. 22, reprinted in 1986 U.S.Code Cong. & Admin.News 3045 ("Therefore, the Judiciary Committee amendment reaffirms that, in the absence of a government enforcement action, judicial review of the selection of a response action should generally be postponed until after the response action is taken.").
 
 
 26
 This Court has already recognized that "the primary purpose of CERCLA is the prompt cleanup of hazardous waste sites." Dickerson v. Administrator, EPA, 834 F.2d 974, 978 (11th Cir.1987) (quoting J.V. Peters & Co. v. Administrator, EPA, 767 F.2d 263, 264 (6th Cir.1985)). Prior to the 1986 amendments that enacted section 113(h), courts uniformly held that challenges to a Record of Decision were barred before full implementation. See, e.g., Wagner Seed Co. v. Daggett, 800 F.2d 310, 314-15 (2d Cir.1986); Lone Pine Steering Committee v. EPA, 777 F.2d 882, 886-87 (3rd Cir.1985), cert. denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). Most of the courts that have addressed this issue after the 1986 amendments have reached the same conclusion. See, e.g., Frey v. Thomas, slip op. 88-948-c, (S.D.Ind. December 6, 1988) ("In light of this legislative history, the Court finds that 42 U.S.C.A. Sec. 9613(h)(4) permits citizens' suits challenging EPA actions only once a remedial action or discrete phase of a remedial action has been completed."); Chemical Waste Management, Inc. v. EPA, 673 F.Supp. 1043, 1055 (D.Kan.1987) ("the legislative history of section 113(h) establishes that it was designed to preclude piecemeal review and excessive delay of cleanup"); cf. Dickerson, 834 F.2d at 977 ("42 U.S.C.A. Sec. 9613(h) clearly provides that federal courts do not have subject matter jurisdiction for preenforcement review of EPA removal actions pursuant to section 9604."); but see Cabot Corp. v. EPA, 677 F.Supp. 823 (E.D.Pa.1988) (allowing preimplementation review under section 9613(h)(4)). Because this challenge does not fit within section 113(h)(4), we lack jurisdiction over this challenge to the implementation of the remedial action plan under section 113(h). Plaintiffs argue that the action that caused the injury was the decision to employ an offsite remedial scheme and to solicit bids for the disposal of the toxic waste. Plaintiffs argue that this decision has already been taken, and that therefore they fit within section 113(h)(4)'s exception to section 113(h). This argument fails, however, because plaintiffs challenge the implementation of the remedial action plan selected, not the selection of an offsite remedial action plan in general.
 
 
 27
 The district court found that section 113 does not remove this case from federal jurisdiction because of the last sentence of section 113(h)(4), which provides: "Such an action [under section 310] may not be brought with regard to a removal where a remedial action is to be taken at the site." This sentence has no bearing on whether section 113(h) applies in this case, however. Plaintiffs challenge not a removal but a remedial action. The EPA has already conducted an onsite removal action. The district court seems to read "removal" as "transportation." Compare 42 U.S.C.A. Sec. 9601(23) (removal "means the cleanup or removal of released hazardous substances from the environment") with 42 U.S.C.A. Sec. 9601(26) (defining transportation). The district court also seems to read the last sentence of section 113(h)(4) to require neutralization of the hazardous wastes prior to implementation of any offsite remedial action. That is simply incorrect.
 
 
 28
 The district court also found that a September 18, 1988, amendment to CWM's disposal contract constituted a substantial alteration of the original Record of Decision, and that that alteration required notice to the State of Alabama and an opportunity for "reconciliation" among the States of Alabama and Texas and the EPA. The district court apparently relied on section 117(c), 42 U.S.C.A. Sec. 9617(c), which provides: "After adoption of a final remedial action plan ... if [a subsequent remedial action] differs in any significant respects from the final plan, the President or the State shall publish an explanation of the significant differences and the reasons such changes were made." In this case, EPA and CWM increased the amount of hazardous wastes to be shipped from 36,000 tons to 47,000 tons. The plan itself remained offsite treatment and disposal. This alteration does not cause the remedial action to differ significantly from the original plan within the meaning of section 117(c). Even if this change were deemed significant within the meaning of section 117(c), however, the only consequence would be publication of the significant differences and the reasons for the changes in a major local newspaper. See 42 U.S.C.A. Sec. 9617(d). Section 117 does not authorize private parties to halt implementation of a remedial action plan. We hold that the district court lacked jurisdiction over this action to the extent plaintiffs challenge EPA's remedial action plan.
 
 
 29
 Plaintiffs argue that this is not a challenge to the remedial action plan selected for the Geneva Industries site, and that therefore section 113(h) does not apply. Plaintiffs' complaint belies this assertion. In paragraph B of their prayer for relief, for example, plaintiffs requested a preliminary injunction enjoining the EPA from participating in the shipment of these wastes from Texas to Alabama and in any further remedial action to be taken in connection with the Geneva Industries site. In paragraph C, plaintiffs requested a permanent injunction along the same lines. In paragraph D, plaintiffs requested the district court to reverse the EPA's selection of this remedial action plan on numerous substantive grounds. In paragraph E, plaintiffs requested a mandatory injunction compelling EPA to reopen its Record of Decision.
 
 
 30
 To the extent plaintiffs' complaint may in part be read as not challenging the remedial action plan and therefore not removed from federal jurisdiction by section 113(h), we address the merits of plaintiffs' claims briefly. The district court held that under CERCLA, plaintiffs were entitled to notice and an opportunity to participate in the development of the Record of Decision issued regarding the Geneva Industries site. The State of Alabama argues it is an affected state within the meaning of section 104(c)(2), and therefore was entitled to notice and an opportunity to participate in the public hearings regarding the appropriate remedial action for the cleanup. The Record of Decision was issued September 18, 1986. Alabama only arguably became "affected" within the meaning of section 104 in April 1988, when CWM received the contract to dispose of these hazardous wastes at its Emelle, Alabama, facility. See 42 U.S.C.A. Sec. 9604(c)(1) (addressing "the State or States in which the source of the release is located"). Alabama thus was not an affected state within the meaning of section 104(c)(2) at the time the EPA issued its Record of Decision. Similarly, the individual citizens of Alabama were not "interested persons" or "affected persons" within the meaning of section 113(k)(2)(B) at the time EPA issued its Record of Decision. They too only became affected or interested within the meaning of section 113(k) in April 1988.[8] To the extent plaintiffs challenge the EPA's cleanup under section 117(a) and (b), it is clear that the EPA has complied fully with the publication and comment requirements. Consequently, we reverse the district court's grant of summary judgment and dissolve the injunction compelling the EPA to reopen its Record of Decision for the Geneva Industries site.
 
 2. Administrative Procedure Act
 
 31
 Plaintiffs argue that the district court had jurisdiction over this claim under the APA. Plaintiffs assert two separate claims under the APA. First, plaintiffs seek to compel the EPA to hold a hearing in which they can express their concerns about the shipment of the toxic wastes from Texas to Alabama. See 5 U.S.C.A. Sec. 706(1). Second, plaintiffs seek to have the EPA's efforts to implement the remedial action plan declared unlawful. See 5 U.S.C.A. Sec. 706(2). The APA creates a presumption that individuals can bring suit to challenge agency actions that cause legally cognizable injury. 5 U.S.C.A. Sec. 702. See generally Clarke v. Securities Industry Assn., 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). If Congress expressly foreclosed or postponed judicial review of these agency actions, however, then that presumption is rebutted. See 5 U.S.C.A. Sec. 701(a)(1). Congressional preclusion to judicial review is in effect a jurisdictional bar to suit. Block v. Community Nutrition Institute, 467 U.S. 340, 353 n. 4, 104 S.Ct. 2450, 2457 n. 4, 81 L.Ed.2d 270 (1984). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." Id. at 345, 104 S.Ct. at 2453. We have already concluded that Congress intended to remove challenges to remedial action plans from the jurisdiction of the federal courts until the remedial action has been taken. The district court thus lacked subject matter jurisdiction over the claims brought under the APA.
 
 III. CONCLUSION
 
 32
 We hold that plaintiffs lack standing to challenge under the fifth amendment EPA's failure to provide them with notice and an opportunity to participate in developing the Record of Decision in which EPA selected offsite disposal as the appropriate remedial action for the General Industries toxic waste site in South Houston, Texas. We also hold that because plaintiffs challenge a remedial action plan selected under section 104 of CERCLA, section 113(h) removes this suit from federal jurisdiction provided in section 113(b). Section 113(h)(4) does not restore federal jurisdiction until the remedial action is taken. As the legislative history indicates, Congress enacted this delay in judicial review to ensure prompt and effective permanent cleanup of hazardous waste sites that threaten human health and safety. Because that intent is clear, the APA does not provide a basis for the exercise of federal jurisdiction. Consequently, we hold the district court lacked subject matter jurisdiction over the challenge to the remedial action plan. To the extent plaintiffs' complaint may be read as not challenging the remedial action, the district court erred in granting summary judgment to plaintiffs and in ordering the EPA to reopen its Record of Decision.
 
 
 33
 The grant of preliminary injunction is REVERSED, the grant of summary judgment is REVERSED, the permanent injunction is DISSOLVED, and the case is DISMISSED for lack of subject matter jurisdiction. The challenge to the bond requirement imposed in connection with the grant of the preliminary injunction is DISMISSED as moot. We do not address defendants' argument that venue was improper in the Middle District of Alabama under section 113(b).
 
 
 
 [1]
 A removal is a short-term action taken to neutralize the immediate health and safety risks created by toxic wastes. See 42 U.S.C.A. Sec. 9601(23). In contrast, remedial action, such as the action challenged in this case, "means those actions consistent with permanent remedy taken instead of or in addition to removal actions.... [T]he term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials." 42 U.S.C.A. Sec. 9601(24)
 
 
 [2]
 Alabama's Hazardous Wastes Management and Minimization Act, Ala.Code Sec. 22-30-1 et seq., governs CWM's Emelle facility. CWM cannot operate this facility without approval from the State of Alabama. See generally Ala.Code Sec. 22-30-12(c) ("no person may commence or continue ... operation of any hazardous waste treatment, storage or disposal facility without having applied for and obtained a permit ..."). Although CWM has not yet received a final operating permit, the State of Alabama authorized CWM to operate its Emelle facility under interim status. See Ala.Code Sec. 22-30-12(i)
 
 
 [3]
 To the extent plaintiffs also seem to assert injury based on the out-of-state nature of these wastes, the Supreme Court has already held that the commerce clause bars such a distinction. City of Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). Although Congress may override the commerce clause by express statutory language, South-Central Timber Development, Inc. v. Wunnicke, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984), it has not done so in enacting CERCLA
 
 
 [4]
 This includes an agreement the State of Alabama entered into with CWM in December 1984 specifically authorizing the Emelle facility to receive PCBs
 
 
 [5]
 That section provides: "The President shall consult with the affected State or States before determining any appropriate remedial action to be taken pursuant to the authority granted under subsection (a) of this section."
 
 
 [6]
 (h) Timing of review
 No Federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action [sic] selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following:
 (4) An action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.
 
 
 [7]
 Section 310 is qualified by the phrase "Except as provided in ... section 9613(h) of this title (relating to timing of judicial review)...."
 
 
 [8]
 Naturally, both the State of Alabama and the citizens of Alabama were entitled to notice and an opportunity to participate in the decision to license CWM's Emelle, Alabama, hazardous waste treatment facility. Both received ample notice, and EPA responded to substantial public commentary during the licensing application stage