**In re Possible Recusal of William M. ACKER, Jr. in Government's Cases.**

**No. 88–Y–1070–S.**

United States District Court,
N.D. Alabama, S.D.

Oct. 3, 1988.

---

Frank W. Donaldson, U.S. Atty., for the U.S.

## MEMORANDUM OPINION

ACKER, District Judge.

On August 12, 1988, this judge conducted a hearing on the question of whether or not he should recuse himself in all or some of the government's cases. The government did not show up for the hearing, but in response to the order issued on June 29, 1988, the government did file an enigmatic written response, which said:

> The United States has *at this time* insufficient information to determine, and no reason to believe, that Judge Acker's proposed general recusal is either necessary or appropriate. It is the United States' view that the matter of recusal is better left for consideration on a case-by-case basis.

(emphasis supplied).

In other words, between June 29, 1988, when the show cause order was issued, and August 9, 1988, when the government responded, the government had not turned up anything that made it feel compelled to suggest a general recusal of this judge in all government cases, comprising approximately 31% of this court's docket. The government did not ask for a continuance to give it more time within which to investigate and to determine the possible bases for such a recusal. If the government had asked for more time, this judge would have given it.

The precipitating cause of the recusal hearing was the government's brief filed in the Eleventh Circuit in *United States v. White,* on May 21, 1988, in which the government asserted, *inter alia:*

> This Court should also bear in mind that the adamance with which a district court makes erroneous rulings should weigh in the determination to remand a case to a different judge.

> \*    \*    \*    \*    \*    \*

> Moreover, since the commencement of this case, the district court has expressed its personal disdain for the Southern Poverty Law Center and for Morris Dees, in particular.

> \*    \*    \*    \*    \*    \*

> It has made all credibility determinations against the government and particularly against Mr. Dees as a witness for the government.

> \*    \*    \*    \*    \*    \*

> The government, no less than any other litigant, is entitled to a fair tribunal, free of the appearance of taint of previously expressed and reversed findings. Likewise, the requirement that judicial proceedings serve the appearance of justice is not diminished because the government is a party.

> \*    \*    \*    \*    \*    \*

> Where a court has fixed its views regarding a case and hardened its position ... the supervisory jurisdiction of this court should be exercised to order reassignment of the case.

Quickly echoing these criticisms, the Court of Appeals went even further than the government by referring not only to this judge's "adamance" but to his "intransigence." *United States v. White,* 846 F.2d 678, 695 (11th Cir.1988). The Court of Appeals conspicuously did not say: "Judge Acker's position has become hardened against the government *in this case.*" In-

stead, it said: "Judge Acker's position has become hardened *against the government.*" (emphasis supplied). This broad finding of bias against the government becomes more significant when it is understood that there was no recusal motion ever filed by the government in the trial court, although this judge handled the case from the time of the self-imposed recusal by Hon. U.W. Clemon in 1984 until the recent order of reassignment by the Eleventh Circuit. Furthermore, no petition for mandamus questioning this judge's qualification to sit in the case was ever filed in the Eleventh Circuit. The fact is that the government waited until it had obtained a result it had every reason to anticipate and then appealed, incidentally seeking this judge's removal without ever having presented the question of this judge's alleged disqualification to the trial court. If this judge's position was hardened against the government, that position surely must have manifested itself to the government long before the date upon which the government filed its brief in the Eleventh Circuit on May 18, 1987.

Not too long after its finding that this judge was disqualified because of his alleged bias, the Eleventh Circuit on August 30, 1988, decided *Giles v. Garwood*, 853 F.2d 876 (11th Cir.1988), in which that Court reviewed a district judge's denial of a recusal motion. *Giles* is in stark contrast to the appellate consideration of recusal in *White* in which there was no formal motion for recusal and no prior *nisi prius* consideration of the issue. The Court said in *Giles:*

> This court is limited to a determination of whether the district court abused its discretion in denying the disqualification motion. *See Davis v. Board of School Commissioners,* 517 F.2d 1044, 1052 (5th Cir.1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). A judge should disqualify himself only if a reasonable person would question his impartiality, or if he has a personal bias against a party. The bias must arise from an extrajudicial source, except in the rare case "where such pervasive bias and prejudice is shown by otherwise judi-

> cial conduct as would constitute bias against a party." *Id.* at 1051.

853 F.2d at 878.

This court could not be in more perfect agreement with what the Eleventh Circuit said in *Giles*, and, agreeing, notes that the Eleventh Circuit of its own motion ordered the undersigned judge removed without any discussion of extrajudicially induced bias, necessarily meaning that it found this judge to be within that rare category of judges who by their own judicial conduct have manifested pervasive bias and prejudice. This was said in *White* of a judge who denied a pre-conviction motion for acquittal, submitted a case to the jury and set aside the verdict of guilty on post-conviction motion, despite his belief that the government had not proven an essential element of its case, simply in order to give the government an appeal opportunity. This judge could have barred such an appeal by double jeopardy if its position had been hardened enough.

The extraordinary nature of the Eleventh Circuit's action invites this court to consider the broader implications of the action. With perfect timing, Hon. Jack B. Weinstein, formerly Chief Judge of the United States District Court for the Eastern District of New York, in August, 1988, published an article, "The Limited Power of the Federal Courts of Appeals to Order a Case Reassigned to Another District Judge." 120 F.R.D. 267. Judge Weinstein argues primarily that an appellate court has no power to control judge selection in a district court. This court agrees thoroughly with Judge Weinstein when he says:

> The assumption of power by an appeals panel to control judge selection can only add to the burdens placed on the trial courts, while adversely and unnecessarily lowering their morale.

> \* \* \* \* \* \*

One justification relied on by appeals panels ordering reassignment is that this is a power seldom used by the courts of appeals. That excuse hardly answers the argument that the power does not exist.

There are, of course, instances in which recusal by a trial judge is desirable. This result can be obtained on motion at nisi prius, ultimately reviewable on appeal, or by mandamus with notice to the trial judge and the right to be heard.

*Id.* at 267.

\* \* \* \* \* \*

Only after a motion to recuse is made by a party at trial and denied, or a mandamus proceeding is brought in the court of appeals, does the appellate court have the power to order transfer of a case, on the ground that the trial court abused its discretion in failing to recuse. The original decision whether to recuse is for the district judge. The system for assigning cases to trial judges is for the district court to administer. Congress delegated that power to the district courts under 28 U.S.C. § 137. There are good policy reasons for that delegation.

*Id.* at 268.

\* \* \* \* \* \*

The general power of appellate courts to "require further proceedings ... as may be just" does not encompass the division of business. That appellate power is contained in 28 U.S.C. § 2106, reading:

§ 2106. Determination

The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree or order, or require such further proceedings to be had as may be just under the circumstances.

Appropriate proceedings may be ordered, but the statute does not authorize the appellate court to say what judge in a multijudge court shall preside—that issue is covered by section 137.

*Id.* at 270.

\* \* \* \* \* \*

While mandamus may lie to correct error in a case of disqualification, the power asserted by some panels of court of appeals judges to reverse a district court decision with an order that the case be assigned to another district judge is without statutory basis.

\* \* \* \* \* \*

[M]ost panels confined their remarks on reassignment to "recommendations" to the district court on how it should exercise its statutory authority to divide its business. *See* 28 U.S.C. § 137; *United States v. Clark*, 475 F.2d 240, 251 (2d Cir.1973) ("a hearing before another member of the court is advisable"); *United States v. Brown*, 470 F.2d 285, 288–89 (2d Cir.1972) ("we think it best that further proceedings be assigned to a different judge"); *United States v. Bryan*, 383 F.2d 90, 91 (2d Cir.1968) (assumes trial judge "will act pursuant to our views regarding the preferred practice" of a new trial before another judge); *United States v. Mitchell*, 354 F.2d 767, 769 (2d Cir.1966) (chief judge, "in the interest of sound judicial administration, would be wise to re-assign the case to another judge for re-trial").

*Id.* at 277.

\* \* \* \* \* \*

Where disciplinary action against a judge is required, the judicial council may have power to act under 28 U.S.C. § 372(c) (assuming that this provision is constitutional). The judicial council of the various circuits are subject to detailed rules controlling the exercise of this power.

*Id.* at 279.

An unpublished opinion of the Eleventh Circuit in effect agrees with Judge Weinstein by arguing eloquently that parties, *even through judges*, should not be allowed to manipulate judicial selection, which in all instances should be random:

This court holds it to be of great importance that case assignment be made randomly, without influence or manipulation by any party *or judge*. If litigants are allowed to "judge shop," the integrity of the entire process is compromised ... to

allow a litigant to pick and choose judges would undermine a selection process that the procedures of this court insure are free of taint.

*Curry v. Baker,* No. 86–7639 (11th Cir., Sept. 24, 1986) (emphasis supplied).

Both in its order of June 29, 1988, and during the oral hearing of August 12, 1988, this judge made it clear how seriously he takes the disqualification issue, not because he is thin-skinned, but because the issue is so important to the administration of justice. On August 12, 1988, this judge was unaware of Judge Weinstein's article. Nevertheless, he did not take lightly the possibility that a "reasonable person" could *perceive* that the United States cannot receive fair and impartial treatment at the hands of a particular district judge. Although a recusal motion was never filed with the judge whose recusal was not sought until the appeal was in progress, it is not inappropriate for the vicariously recused judge to take an "after-the-fact" look at himself and at his accusers under the glaring lamp of 28 U.S.C. § 455(a) and (b).

The purpose of the 1974 amendment to the general disqualification statute was to enact a stricter, more comprehensive and objective disqualification law. H.Rep. No. 1453, 93rd Cong., 2d Sess. 3, *reprinted* in 1974 U.S.Code Cong. & Adm.News 6351. This new law was intended to displace the subjective "in the opinion of the judge" test and the so-called "duty to sit" criterion, and in their stead to substitute a "reasonable man" test for determining whether a judge should disqualify himself. *Parrish v. Board of Commissioners,* 524 F.2d 98 (5th Cir.1975), *cert. den.,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188. It must be kept in mind, however, that this objective test is initially to be applied by the *nisi prius judge himself and not by some self-appointed supervisory appellate tribunal. See Weinstein, supra.*

The fact that the "reasonable man" standard applies places this court in a quandary. The three judges on the panel of the Eleventh Circuit in *White* presumably are "reasonable men." They have purported to find as a fact that this court is biased against the government. This presumption that appellate judges are reasonable, however, must be a rebuttable presumption. When appellate judges arrogate into themselves powers they do not possess under the Constitution or under any statute of Congress, can they be described as "reasonable men"? When appellate judges remove a lower court judge for "intransigence" because the appellate judges' preferred litigant belatedly finds fault with the district court's credibility determinations, are the appellate judges "reasonable men"? Does the presumption disappear when an appellate judge holds a district judge disqualified without any *nisi prius* challenge during four years while the case was before the district judge? This last question becomes more ironic in light of the recent Eleventh Circuit holding that a party can waive what would otherwise be a classic conflict of interest by a lawyer. *See Cox v. American Case Iron Pipe Co.,* 847 F.2d 725 (11th Cir.1988). Apparently a party has an obligation to interpose a timely objection to a *lawyer's* alleged disqualification but not to a *judge's* alleged disqualification. This anomaly was not discussed in *Weinstein, supra.* Lastly, can appellate judges be deemed "reasonable men" when the Supreme Court said of the Eleventh Circuit as it just as easily could say of the Eleventh Circuit in *White:*

> [W]ithout examining the record or discussing its obligations under Rule 52(a), the court [Eleventh Circuit] simply expressed disagreement and substituted its own factual findings for those of the District Court.
>
> \* \* \* \* \* \*
>
> Even assuming, somewhat generously, that the Court of Appeals recognized and applied the appropriate standard of review, we cannot agree that the District Court's factual findings were clearly erroneous. [I]ts failure to defer to the District Court's findings ... is difficult to fathom.

*Amadeo v. Zant,* 486 U.S. ——, 108 S.Ct. 1771, 1777, 1779, 100 L.Ed.2d 249 (1988). Perhaps the Supreme Court, in an exercise of its "supervisory jurisdiction," should

have reassigned *Amadeo* to another Court of Appeals because of the "adamance" and "intransigence" of the Eleventh Circuit in avoiding its obligation to follow clear Supreme Court precedent.

█] Despite the serious doubts expressed, this judge finds that the presumption that the Eleventh Circuit is composed of "reasonable" people is not overcome by any facts that might indicate otherwise. Considering this powerful source, this judge now takes a close look at what he should do in the future when assigned the government's cases.

As mentioned during the hearing on August 12, 1988, one of the Associated Press stories about the Eleventh Circuit's opinion in *White* did not quote the appellate court's finding that this judge's position is "hardened against the government." 846 F.2d 696. Instead, A.P. told the world: "Federal judge in Birmingham ... was chastened by a higher court *for showing bias in favor of Ku Klux Klan.*" (emphasis supplied). Here is the crux of the matter! A.P. unfortunately but correctly deduced that the Eleventh Circuit was not so much concerned with a general bias by this court against the government but with a specific bias *in favor of the Klan.* The panel has created the public impression that this judge wears a black robe by day and a white robe by night. The secondary proof of this public perception comes from the lead editorial in The Atlanta Constitution shortly after *White* was published. This prestigious newspaper, having the largest circulation in the Eleventh Circuit, interpreted *White* not only as finding this judge unable "to view impartially a series of Ku Klux Klan cases," but that the "tenacious" work of the Southern Poverty Law Center "drew the enmity of Judge Acker." The tertiary proof of this public perception comes not from media, but from the government's own concentration during the appeal on this judge's credibility determinations against the government and against Mr. Dees of the Southern Poverty Law Center. That organization, in its eagerness to obtain a federal prosecution of the Klan, displayed fake law enforcement badges as a means of obtaining statements from prospective witnesses and obtained from a federal judge in a civil case an *ex parte* order denying the existence of any Fifth Amendment privilege and requiring civil defendants to testify against themselves upon penalty of contempt and/or of the entry against them of a sizeable default judgment not dischargeable in bankruptcy. This judge also admittedly is puzzled over the government's appellate assertion that the government's prosecution was "stalemated" by the actions of this judge and that the government could not proceed in its criminal case without the suppressed civil depositions. The government always claimed that it did not use any of the information directly or indirectly obtained from the civil depositions taken by the Southern Poverty Law Center in presenting its case to the Grand Jury, and it proved its ability to proceed to trial by actually obtaining a conviction of Klan defendant Creekmore without using a single one of the civil depositions. Lastly, this court early indicated its doubt, obviously shared by the Department of Justice in 1979 when the parade made the subject of the criminal prosecution took place, that the essential elements of a crime under the federal statute here invoked could not be proven.

While he had the case, this judge totally overlooked what his Chief Judge, to whom *White* was remanded, quickly discerned, namely, that the conspiracy count of the indictment is drafted so as to describe only a misdemeanor, rather than the felony that the draftsman thought he was describing. Hon. Sam C. Pointer, Jr., surely is not biased against the government lawyers for being smarter than this judge was and smarter than the government lawyers were for four years. If this judge had written an opinion recognizing this deficiency in the government attorneys' work, he would probably have been criticized more severely than he was by the Eleventh Circuit.

All of this, of course, inevitably adds up to a deep-seated bias by this judge in favor of the Klan and the same kind of prejudice against the Southern Poverty Law Center. It has nothing to do with this judge's re-

spect for "due process," or for the Fifth Amendment, or for the strict construction of criminal statutes in favor of an accused.

A secondary consideration, if a consideration at all, is the effect that a broad recusal would have when 31% of this court's calendar involves the federal government as a party.[1]

Thirdly, the government itself equivocates on the question of blanket recusal, saying in its response that "Judge Acker's proposed *general* recusal is neither necessary nor appropriate." (emphasis supplied). Could it be that the government likes Judge Acker in some of its cases? The same Civil Rights Division of the same Department of Justice that accused this judge of pervasive bias in *White* recently expressed its satisfaction with him in *Knight v. State of Alabama*, CV 83–AR–1676–S, a high profile case involving a strident controversy between black citizens and white citizens over the future of higher education in Alabama, but a case in which this judge recused himself anyway on September 23, 1988.

■ Lastly, this court is impressed by a recent decision, *In re Grand Jury Investigation of New Vrindaban, Inc.*, 687 F.Supp. 1032 (N.D.W.Va.1988), in which Hon. Robert Earl Maxwell, Chief Judge of the Northern District of West Virginia, refused to recuse himself on the government's motion, holding that "any appearance of partiality" was created by the government itself by its attorneys' innuen-

do that the court was resisting a criminal investigation. In other words, when a public perception of bias by a particular judge is falsely fostered by one of the parties in a case, that party should not be allowed to obtain the recusal of that judge in that case or in any other case. The parties in *White*, particularly the party with 31% of this court's cases, should not be able to judge-shop by the expedient, or the bootstrap, of forcing the recusal of judges who disagree with the government's occasionally erroneous positions.

On these bases, the court concludes that there is no compelling reason for the broad recusal originally contemplated. Instead, the court concludes that the only cases in which the Eleventh Circuit in *White* creates an unavoidable and pervasive public perception of bias and doubt about this judge's impartiality in the government's cases are those cases in which a judge under suspicion of wearing a white robe under his black robe should not be sitting. When, after *White*, this judge has received mail addressed to "Exalted Cyclops Billy Acker" and to "Imperial Wizard Bill Acker," and when A.P. and The Atlanta Constitution has said what they said, an adverse public perception has inevitably been created. That perception does preclude this judge under 28 U.S.C. § 455 from sitting in at least a narrow spectrum of the government's cases.

Which cases fall into this recusal category will depend on their particular fact situations. On this point, this court agrees with

1. "Of course, strict ethical standards can also serve as an excuse for a judge to avoid complex and protracted cases. There is a story told involving an action brought by a Bell Company for breach of a patent licensing agreement in a state chancery court. The defendant in that case asserted a vigorous defense which challenged the validity of AT & T's patents and counterclaimed on several exotic and intricate antitrust theories. The issues quickly became much more complicated than the chancery judge could or wished to handle, and it became increasingly clear with every court appearance that the judge wanted out. Then one day the judge appeared in court with a broad smile on his face. He told the parties he had something important to read into the record. He announced that he discovered that he owned 100 shares of Western Electric stock. The Bell Sys-

tem lawyers looked at each other in shock as they were firmly convinced that AT & T owned fully 100% of the shares of Western Electric, and had for some time. As gently as possible, the Bell System lawyers urged the judge to look at his stock certificates. The judge begrudgingly agreed, but stated that, as far as he was concerned, he must recuse himself. Unfortunately for that poor chancery judge, his interest turned out to be in Western Union stock.

Although this particular anecdote involved a state chancery judge, it would blink reality to ignore blithely the fact that docket congestion, understaffing, and the Speedy Trial Act commitments give federal district judges very real incentives to avoid getting saddled with complex and protracted civil litigation."

Levy, *Judicial Recusals*, 2 Pace L.Rev. 35, 38 (1982).

the government's response filed in this proceeding. This judge doubts that he, or any other judge, will soon be assigned another case: (1) in which one national administration's Justice Department investigates a Klan incident and finds no federal criminal violation; (2) in which an interested citizen's group sues a group of Klansmen for a large sum of money and asks a federal judge for any evidence of criminal conduct to be turned over to the Justice Department; (3) in which the federal judge thereafter orders the civil defendants to testify against themselves (believing that any criminal statute of limitations had run) upon penalty of contempt and/or default judgment; (4) in which a new administration's Justice Department thereafter indicts the civil defendants on a last minute, "iffy" indictment based, in part, on forced confessions; (5) in which the confessions are thereafter suppressed; and (6) in which the government in its appellate brief on appeal for the first time charges the district judge with bias and claims that his suppression of the civil depositions has had a devastating effect on the government's ability to prosecute, after the government has already obtained a conviction without any of the civil depositions in the only case it has tried. If this judge had been afforded an opportunity to rule on a recusal motion in such a case, he would have denied it, as would any reasonable judge. However, now that the unfiled motion has, in effect, been both invented and ruled on by a higher court, and the word has gone out that this judge is biased in Klan cases and in Southern Poverty Law Center cases, he will recuse in all federal cases involving alleged Klan activity and in all Southern Poverty Law Center cases, but will necessarily decide on his qualification in all other cases on a case-by-case basis consistent with the above-discussed perception falsely but effectively engendered in the litigating public by the government and by the Eleventh Circuit in *White*.

A friendly proofreader of this opinion suggested that the author needs to take a Dale Carnegie course, and the proofreader may be correct, but this judge would rather not "win friends and influence people" than to despise himself for not speaking out on a subject more important to the system of justice than to one judge.

An appropriate separate order will be entered.

## ORDER

In accordance with the accompanying memorandum opinion, the undersigned judge hereby RECUSES himself until further order in all cases wherein the United States is a party *and* in which any Ku Klux Klan organization, or any person alleged to belong to a Ku Klux Klan organization, is a party. The undersigned also recuses himself until further order in all cases in which the Southern Poverty Law Center is a party or represents a party.

The undersigned will not presently recuse himself in all cases in which the United States is a party. The undersigned will in the future make a case-by-case evaluation, either on motion or, if no motion is filed, *sua sponte*, of the cases in which the United States is a party, keeping in mind (as the parties in such cases should) the finding by the Court of Appeals in *United States v. White*, 876 F.2d 678, that this judge's position is hardened against the United States.

## APPENDIX

### ORDER OR OPPORTUNITY TO SHOW CAUSE

With regard to the undersigned, William M. Acker, Jr., Judge of the United States District Court for the Northern District of Alabama, the United States Court of Appeals for the Eleventh Circuit held, *inter alia*, on June 7, 1988:

A.  ... Judge Acker's position has become hardened against the Government ...

    \*    \*    \*    \*    \* .    \*

B.  This Court has stated that, *where a reasonable person would question the trial judge's impartiality*, reassignment is appropriate.

(emphasis supplied).

    \*    \*    \*    \*    \*    \*

C. In remanding this case to the Chief Judge for the Northern District of Alabama, we act with the sensitivity "that it is not merely of some importance but is of *fundamental* importance that justice should not only be done, but manifestly and undoubtedly *be seen to be done.*" *Rex v. Sussex Justices* (1924), 1 K.B. 256, 259.

(emphasis the Court's).

\* \* \* \* \* \*

D. Reassignment will preserve the appearance of justice

. . . . .

These broad, sweeping, and highly serious findings were uttered in response to the Government's charge that the undersigned had manifested bias against the Government, against its lawyers and against its witnesses. Within the three states comprising the Eleventh Circuit, and elsewhere within the United States since June 7, 1988, there has been media comment agreeing generally with the above-quoted expressions of the Court of Appeals.

Each judge of this court has on file with the Clerk a list of entities as to whom, or as to which, he is automatically recused. This is for the reason that Canons 1, 2 and 3 of the Code of Judicial Conduct for United States Judges echo the eloquent admonition of *Rex v. Sussex Justices,* above quoted by the Court of Appeals. Furthermore, Congress in 28 U.S.C. § 455, mandates:

> *Disqualification of justice, judge, magistrate or referee in bankruptcy.*
>
> (a) Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in a proceeding in which his impartiality might reasonably be questioned.
>
> (b) He shall also disqualify himself in the following circumstances:
>
> > (1) Where he has a personal bias or prejudice concerning a party....

As recently as June 17, 1988, the Supreme Court of the United States spoke to the remedies available under § 455:

> Although § 455 defines the circumstances that mandate disqualification of federal judges, it neither prescribes nor prohibits any particular remedy for a violation of that duty. Congress has wisely delegated to the judiciary the task of fashioning the remedies that will best serve the purpose of the legislation.

*Liljeberg v. Health Services Acquisition Corp.,* —— U.S. ——, ——, 108 S.Ct. 2194, 2202–2203, 100 L.Ed.2d 855 (1988).

The undersigned agrees thoroughly with the Canons, with § 455, with the Supreme Court in *Liljeberg,* and with the absolute that our system demand not only that a judge be fair but that the public *perceive* that a judge is not unfair to any litigant, large or small. Inquiry is necessitated "where a reasonable person would question the trial judge's impartiality." Necessarily assuming that the Eleventh Circuit consists of one or more "reasonable persons," and knowing that they have "questioned this judge's impartiality," the undersigned sincerely agonizes over the public perception of his ability to sit in future in cases in which the Government and its various agencies are litigants, without evoking a possible public perception of bias against the Government.

PREMISES CONSIDERED, the United States is hereby given the opportunity, if it cares to do so, to appear at 10:00 A.M. on August 12, 1988, at Birmingham, Alabama in Courtroom 4–B, Hugo L. Black Federal Courthouse, to show cause why the undersigned should not in future recuse himself in all cases, or in particular kinds of cases, in which the United States, or any agency of the United States, is a party. Not only will the court conduct an oral hearing on August 12, 1988, but the court will consider affidavits and briefs, including serious *amicus curiae* briefs, *filed with the Clerk* on the subject of the undersigned's qualification to sit on the Government's cases or on particular kinds of its cases. The undersigned wishes to make it clear that he does not invite and will not consider either laudatory letters or hate mail, both of which varieties of communication he has already received in abundance since June 7, 1988. This court is neither seeking praise nor condemnation, but feels it necessary that it

create a forum for frank and serious discussion of a very serious subject, namely: "Should a judge whose position is hardened against the Government sit on the Government's cases?"

The Clerk shall mail or otherwise deliver copies of this order to the following:

1. The Attorney General of the United States.
2. The Solicitor General of the United States.
3. The United States Attorney for the Northern District of Alabama.
4. The Judicial Conference of the United States.
5. The Chief Judge of the Court of Appeals for the Eleventh Circuit.
6. The Chief Judge of the United States District Court for the Northern District of Alabama.
7. The American Bar Association.
8. The Alabama Bar Association.
9. The American Judicature Society.
10. The American Civil Liberties Union.
11. The Southern Christian Leadership Conference.
12. The Southern Poverty Law Center.

DONE and ORDERED this 29th day of June, 1988.

