**GUN SOUTH, INC., Plaintiff,**

**v.**

**Nicholas BRADY, Secretary of Treasury; Stephen E. Higgins, Director of the Bureau of Alcohol, Tobacco and Firearms; and William Von Rabb, Commissioner of the United States Customs Service, Defendants.**

**Civ. A. No. 89–AR–0551–S.**

United States District Court,
N.D. Alabama, S.D.

April 26, 1989.

James C. Barton, Robert S. Vance, Jr. and Robert H. Smith, Johnston Barton Proctor Swedlaw & Naff, Birmingham, Ala., for plaintiff.

Frank W. Donaldson, U.S. Atty., George Batcheler, Asst. U.S. Atty., Nicholas Brady, Sec. of the Treasury, Dept. of the Treasury, William Von Raab, Com'r., U.S. Customs Services, Office of Legal Counsel, Teresa Troy, Stephen E. Higgins, Bureau of Alcohol, Tobacco & Firearms, Office of

Legal Counsel, John R. Bolton, Sandra M. Schraibman, Alan L. Ferber and Shawn Jensen, Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION

ACKER, District Judge.

Gun South, Inc., seeks declaratory and injunctive relief against, or a writ of mandamus directed to, Nicholas Brady, Secretary of Treasury, Stephen E. Higgins, Director of the Bureau of Alcohol, Tobacco and Firearms, and William Von Rabb, Commissioner of the United States Customs Service. Pursuant to Rule 65(a)(2), F.R. Civ.P., the court, without objection by any party, telescoped the original prayer for a preliminary injunction into a consideration of the merits. Defendants filed both an answer and a motion for summary judgment which defendants agreed could be taken under submission earlier than the regular ten-day period mandated by Rule 56, F.R.Civ.P., in order that the entire matter could be decided as expeditiously as possible. The nature of the relief sought and the nationwide importance of the issues presented call for an immediate disposition, particularly when the issues are predominantly, if not exclusively, issues of law and not of fact.

Recognizing that the government is very much interested in the outcome of this case, and mindful that the Eleventh Circuit earlier found this court to have "become hardened against the government," this court, as it promised to do in *In Re: Possible Recusal of William M. Acker, Jr. in Government's Cases*, 696 F.Supp. 591 (N.D.Ala.1988), examined itself, declined to find itself disqualified, and thereupon moved the case toward disposition as rapidly as the court's and the parties' schedules would permit. The parties agree that most, if not all, of the facts upon which they respectively rely are undisputed, and that the case basically resolves itself into a question of law. The parties, of course, disagree over the relative significances of various undisputed facts, and, of course, they disagree over the conclusion to which the undisputed facts must lead.

The court not only received evidence and heard oral argument on April 6, 1989, at a preliminary injunction hearing, but has subsequently received and considered numerous affidavits and documents, uncontradicted as to the facts contained therein. Some of the affidavits do contain "conclusions" or "arguments" which have been taken by the court as if they are parts of the well-written briefs.

### Findings of Pertinent Facts

The court will not make findings as to every fact which one or more of the parties holds up as important. The court will limit its findings to the relevant facts, i.e., those facts upon which the court will rely for its ultimate conclusion.

At all times pertinent Gun South was a wholesale gun dealer in the United States, with its only place of business located in the Northern District of Alabama. It held valid federal licenses under 18 U.S.C. § 923 and 27 C.F.R. §§ 178.41–.60. Gun South had and has an exclusive contract with an Austrian gun manufacturer, Steyr–Daimler–Puch, for the importation and distribution of Steyr rifles within the United States. At all times pertinent, Gun South was duly registered, pursuant to the Arms Export Control Act of 1976, to engage in precisely the business it was in.

On October 4, 1988, defendant Higgins, as Director of ATF, issued to Gun South a written permit to import 1,700 Steyr AUG "semi-automatic rifles" and 200 "receiver assemblies." This permit contained a special stamp in addition to the printed material. The stamp said: "NOT TO INCLUDE FULLY AUTOMATIC FIREARMS." The weapons listed and described on the said permit are *semi* automatic. Generally speaking, a semiautomatic weapon like the Steyr AUG requires that the trigger be pulled for the firing of each round, whereas a fully automatic weapon allows rapid, repeating fire as long as the trigger remains depressed. The perfect example of a fully automatic weapon is, of course, a machine gun. On February 21, 1989, Director Higgins issued to Gun South another permit, this time authorizing the importa-

tion of an additional 3,000 Steyr AUG rifles and an additional 200 receiver assemblies.

These two permits were lawfully issued pursuant to 18 U.S.C. § 925(d)(3). They were regular in every respect. This statute, in the form in which it existed when these permits were issued, contains the following language:

(d) The Secretary [of Treasury, the department which contains the ATF, which, in turn, is in charge of the firearm aspect of the Secretary's responsibility] *shall* authorize a firearm ... to be imported or brought into the United States or any possession thereof if the firearm ...

\* \* \* \* \* \*

(3) is of a type that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1954 and *is generally recognized as particularly suitable for or readily adaptable to sporting purposes* ...

\* \* \* \* \* \*

The Secretary shall permit the conditional importation or bringing in of a firearm *... for examination and testing in connection with the making of a determination as to whether the importation or bringing in of such firearm ... will be allowed under this subsection.*

(emphasis supplied).

A separate statute, 18 U.S.C. 924(a), establishes that the importation of an unapproved firearm in violation of 18 U.S.C. § 925(d)(3) constitutes a crime against the United States. This statute says:

*Penalties*

(a)(1) ... whoever ... willfully violates any ... provision of this chapter, shall be fined not more than $5,000, imprisoned not more than five years, or both....

The permits issued by ATF to Gun South on October 4, 1988 and on February 21, 1989, were not accompanied by any oral or written warnings or reservations or caveats. They were clear and unequivocal.

On January 23, 1989, acting pursuant to its permits, Gun South ordered and inalterably obligated itself to pay no less than $700,000 for 800 Steyr AUG semi-automatic rifles and certain accessories, none of which accessories can be used to convert the rifles into fully automatic weapons. Gun South obligated itself to pay this $700,000 in advance toward a larger total purchase price. This constitutes, in effect, an out-of-pocket expense for Gun South. Gun South is absolutely committed to at least $700,000, from which there is no retreat. The funds are guaranteed by Gun South's local bank.

At the time Gun South first undertook to become Steyr's dealer in the United States, Gun South sought, and obtained from Edward M. Owen, Jr., the Chief of ATF's Technology Branch, a written finding or determination that the Steyr AUG "has been approved for importation as a firearm which is suitable for sporting purposes." It must be assumed that this approval was after the "examination and testing" called for by § 925(d). The finding tracked the statutory language in § 925(d)(3), and was intended to do so. Further explaining, Mr. Owen wrote in the same approval letter to Gun South: "This classification means that the AUG semi-automatic rifle may be imported by licensed importers for resale in the civilian marketplace." This last sentence was a free, but sound, piece of legal advice.

Between the date upon which the last permit was issued by ATF to Gun South and March 15, 1989, there was no change in the controlling statute, no change in the controlling federal regulations or in ATF's permitting procedures, no change in the design of the AUG, and no change in the official ATF finding that the AUG is suitable as a sporting gun.

In recognition of the growing problem of drugs and drug-related crimes of violence in the United States, President Bush, after his inauguration in January, 1989, with Congressional approval, created a new cabinet-level position and agency. The agency is entitled, "Office of National Drug Policy." President Bush then appointed William H. Bennett as what the media immediately began to refer to as the "Drug Czar." Insofar as this court has been able to ascertain, the Office of National Drug Policy

has no precise statutory interconnection with, or official relationship with, the Department of Treasury or to either of its sub-agencies, ATF or the Customs Service, but it is obvious that the President intended to clothe Director Bennett with broad powers to address a widely perceived and serious societal problem.

Director Higgins has filed an affidavit in support of defendants' motion for summary judgment. Even if he were not entirely credible, he is uncontradicted when he says:

> In the early part of March, 1989, William J. Bennett, Director, Office of National Drug Policy, and I discussed the growing problem presented by semi-automatic assault-type rifles and their use in crime in the United States. ATF's authority to approve or disapprove the importation of assault-type rifles under 18 U.S.C. § 925(d)(3) was discussed in the course of these discussions.
>
> Pursuant to the discussions between Director Bennett, Secretary Brady, and myself, on March 14, 1989, Director Bennett announced that Secretary Brady had decided to suspend, effective immediately, the importation of several makes of assault-type weapons, pending a decision as to whether these weapons are, as required under § 925(d)(3), "particularly suitable for or readily adaptable to sporting purposes."

It is of some interest that Director Bennett, who has no statutory authority to speak for Secretary Brady, did so. Nowhere in the record does any written authority from Secretary Brady to Director Bennett appear by which Secretary Brady designated Director Bennett as Brady's spokesperson.

Following up Director Bennett's announcement, ATF several days later, on March 27, 1989, formally promulgated the so-called "ban" or "moratorium" in a memorandum from Director Higgins to Commissioner Von Rabb. The said memo, in pertinent part, said:

MEMORANDUM TO:
Commissioner of U.S. Customs
FROM:
Director

SUBJECT:
Release of semiautomatic rifles

Under 18 U.S.C. section 925(d)(3), firearms may only be imported into the United States if it is determined that they are generally recognized as particularly suitable for or readily adaptable to sporting purposes.

ATF has issued permits for the importation of certain semiautomatic rifles. Since these firearms may not meet the statutory requirement for importation, we have suspended the permits, to the extent that they cover the subject firearms, until a determination can be made of their importability. Attached is a list of the importers and firearms affected by this action. Accordingly, it is requested that the Customs Service take appropriate action to prevent the introduction of these firearms into domestic commerce.

The attachment to this memo described five foreign-made semiautomatic weapons, one of which is the Steyr AUG. Prior to this suspension, which was obviously the product of a "hurry-up" skull session, if not a stampede reaction set off by Director Bennett, there was no opportunity for any input from any American gun dealer or any foreign gun manufacturer. In other words, there was no fact-finding hearing, formal or informal, before the suspension order was handed down. Furthermore, during the very short period of time in which the question was under consideration by ATF, no actual reevaluation of the Steyr AUG was conducted by Mr. Owen, or by any other ATF technical expert for the purpose of deciding whether or not ATF had been correct in its earlier finding that the Steyr AUG is "generally recognized as particularly suitable for or readily adaptable to sporting purposes." The very officials at ATF who were assigned the duty of making such technical evaluations were probably as surprised as Gun South was at the sudden order directed indiscriminately at these five particular weapons.

When Director Higgins' memo came to the attention of the world, including Gun South, Gun South was understandably un-

sure of the effect of the "suspension" on the weapons it had already ordered, had irretrievably purchased, and which were in transit to the United States pursuant to valid permits. Either the memo excluded pre-permitted weapons already ordered, or it was unclear on the subject. Under Gun South's peculiar set of circumstances, i.e., its already having bought a sizeable number of weapons under valid permits, and after being encouraged to do so by its worried Austrian manufacturer, Gun South sought a clarification by ATF or an expression of ATF's true intent with respect to the Steyr rifles in transit. Thereupon Gun South was orally, but unequivocally, informed at least twice by ATF personnel having perfect ostensible authority that the so-called "ban" did *not* apply to weapons purchased under pre-existing permits, and that the suspension only prevented the issuance of new permits for the five listed guns until further notice. An official of the Department of Treasury was quoted in a national news story on March 25, 1989, in the following manner:

In announcing the moratorium on new permits, *the officials indicated that they had no power to restrict imports of weapons for which permits had already been granted.* But Drake said that the agency, which has been trying to persuade importers to halt assault gun shipments voluntarily, now believes that it has the authority to make that ban mandatory.

(emphasis supplied).

When Gun South's large shipment of Steyr AUG's arrived by air freight at the airport in Birmingham, Alabama, they were interdicted by the Customs Service pursuant to Director Higgins' order. Gun South was not allowed to take delivery, precipitating this complaint. Steyr's position, which is undoubtedly correct, is that these weapons are now owned by Gun South, although in the custody and control of the Customs Service. Unless the shipment is promptly released to Gun South, Gun South will suffer an indeterminate monetary loss, including the probable loss of a valuable contractual relationship with Steyr–Daimler–Puch; the probable loss of valuable contractual relationships with local distributors and customers in other states of the United States; the loss of interest paid on borrowed money; the loss of bank credit; and the loss of potential profits. Finally, Gun South may very well face imminent bankruptcy unless it can generate the cash flow it anticipated from the resale of these weapons, necessary to pay its bills. Gun South has no relationship with any American gun manufacturer. Although very similar American-made weapons are not the subject of this suspension and can this very minute be manufactured, bought and sold in large quantities, Gun South's Steyr rifles sit on the tarmac.

On March 29, 1989, one day before Gun South filed the instant complaint, Director Higgins sent out another memorandum, this one to an Assistant Secretary of the Treasury. This memo, *inter alia*, said:

To this point in time, ATF's actions have been limited to the five types of firearms listed in the Bennett press release; however, there are compelling reasons for expanding the so-called ban to cover all imported firearms which fairly fall with the assault rifle category. ATF has compiled a list of imported assault type weapons which are indistinguishable in terms of design, appearance and function to the original five. The factual, legal and policy considerations all indicate that our actions should be expanded to cover these additional weapons. The failure to include these additional weapons would actually undercut our legal basis for taking the actions we have taken to this point, and leave an embarrassing loophole in our policy objectives.

\* \* \* \* \* \*

The failure to expand the list to all similar weapons may also make us vulnerable if aggrieved importers seek injunctive relief asking the courts to allow them to continue to import the weapons based on prior approval during the pendency of our reexamination of the issues. It will be difficult, if not impossible, to provide a rational basis for singling out the original five for special treatment while approving the importation of hun-

dreds of thousands of virtually identical weapons.

\* \* \* \* \* \*

... we are not in a position to assert that the original five constituted a selective list of those firearms most deserving of special treatment based on their use in crime or some other factor.

By the time all similar imported semi-automatic weapons had been added to the banned list after this suit was filed, Gun South could very easily have taken delivery of its Steyr AUG's, which had arrived in Birmingham and were ready to be picked up but for the ban. In Director Higgins' memo of March 29, 1989, he correctly anticipated one line of attack on the ban, namely, an alleged violation of "equal protection." Either in response to the Higgins' memo, or in response to Gun South's complaint filed in this court, defendants inferentially confessed their initial constitutional error by expanding the suspension to include *all* foreign-made semiautomatic rifles. This expansion may constitute a bonanza for the American manufacturers, who cannot be controlled under any present statutory or regulatory scheme. Neither the Secretary, nor ATF, nor the Customs Service can stretch 18 U.S.C. § 925(d)(3) to stop the sale of domestic weapons, even after sitting in judgment on them for their suitability or adaptability for sporting purposes and deciding that they are too dangerous to be allowed in the hands of the general, gun-toting public. Perhaps this is the path the President and Congress will take, but they have not taken that path yet.

Director Higgins, in his affidavit submitted by defendants and referred to *supra*, says something else, too. He says:

It is my opinion that delaying the importation of these rifles for a brief period, *not to exceed 90 days*, is reasonable in light of the public safety issues presented by these types of weapons and would not cause plaintiff [Gun South] irreparable harm.

(emphasis supplied).

Although rumor has it that this ban is expected either to come to an end within 90 days or to be made permanent, or in some way amended, the 90 days gratuitously referred to by Director Higgins does not reveal the date upon which the 90 days began to run, and Director Higgins clearly makes no guarantee. The widespread publicity on this very volatile and technically difficult subject would seem to suggest that the ban was instituted not just for the purpose of a re-study by ATF of particular weapons, or of a class of weapons previously deemed suitable for sporting purposes, but to give Congress time thoroughly to study, and eventually to legislate appropriately on, the subject. This procedure may require years. It may never bear palatable legislative fruit. It will be extremely difficult to draft legislation which will both pass constitutional muster and satisfy strong lobbies, and which can rationally and understandably distinguish between those weapons which are more likely to be used to kill a bear or a turkey or a snake, and those weapons which are more likely to be used (not by accident) to kill a man or a child. It goes without saying that Daniel Boone's Kentucky long rifle could have been used to render permanently motionless all five of the living creatures above enumerated. Not only are there severe technical problems in drafting such legislation, as reflected by the testimony of Mr. Owen in this very case (he testified that he still believes the Steyr AUG to be entirely suitable for sporting purposes), but the implications for international "free trade" and U.S. foreign relations are mind-boggling. This court would be surprised if any bona fide expert would testify before a Congressional committee in regard to the Steyr AUG that this very fine rifle, retailing for approximately $1,000, is so likely to be used to kill a person that it should receive the same treatment as a Saturday night special. Broad drug war strategies and philosophical questions make early legislative answers unlikely, that is, unless Congress is pressured into enacting something half-witted, which the courts will wrestle with for years. A majority of Congress might, for instance, think as Alan Dershowitz of Harvard Law School thinks. In

his recent syndicated column, Professor Dershowitz says:

> The fact that Bennett was able to persuade a federal agency to issue even a temporary ban without prior approval of the president—and, indeed, in the face of earlier public presidential statements to the contrary-demonstrates the enormous potential influence of this new position of drug czar and its incumbent.

> \* \* \* \* \* \*

> Bennett must also realize that the answer to the drug problem will not come from sealing our borders, since some of the most dangerous new drugs are now being manufactured at home to make importation bans an incomplete response to the easy availability of lethal weapons.

Suffice it to say that both before and after Director Bennett announced the ban, various committees of the Congress have been busily considering possible legislative approaches to the "gun problem" as it relates to, or may relate to, the "drug problem." This is proven by the fact that Congress has now made it a federal crime punishable by death to kill somebody during a drug deal.

Director Higgins strangely takes the position in his brief that Gun South's outstanding permits are still "valid." This court's definition of "valid" and Director Higgins' definition of "valid" do not coincide. A valid "permit" presupposes "permission," that is, something under which the permittee can act.

Defendants have graciously agreed to allow Gun South to obtain custody of its Steyr AUG's *if* Gun South will post a sizeable bond guaranteeing that it will not resell or distribute any of the weapons. What exactly Gun South could do with its weapons under such a condition, except to store them expensively, is anyone's guess. Gun South has respectfully declined ATF's offer in this regard.

### Conclusions of Law

Jurisdiction.

Although defendants have not seriously contested the jurisdiction of this court, either *in personam* or subject matter, this court finds the existence of jurisdiction under 28 U.S.C. §§ 1331, 1337, and/or 1361. Venue in the Northern District of Alabama is proper under 28 U.S.C. § 1391(e).

Does Gun South have an adequate remedy at law?

Defendants' first contention is that Gun South is not entitled to extraordinary relief because it has an adequate remedy at law. Defendants fail to satisfy this court that any legal remedy Gun South might have is *adequate.* Defendants do not point to any statute which describes a clear legal remedy or pathway for Gun South. Where is the always required express waiver of sovereign immunity? What is the proper forum? Who is the proper defendant, whose departmental budget would have to respond in monetary damages? This court has only recently had an unfortunate experience with two government departments fighting over which one should pay a judgment against both. Is there any requirement that administrative remedies be exhausted? What actual losses and potential losses would be recoverable? Pre-judgment interest? Interest on borrowed money? Lost profits, which are difficult to prove? Good will, which is difficult to prove? Attorney's fees, which could be very sizeable but are ordinarily not recoverable unless provided by contract or statute? Would a legal action for damages, if filed now, be challenged as premature? After all, the ban may be lifted tomorrow. Could a legal action be amended to accommodate to rapidly changing events? Would a legal action end up as part of a nationwide class action in a faraway forum or with the multi-district panel? If Gun South should have to file for bankruptcy prior to a resolution, in order to protect itself from its creditors, would its trustee-in-bankruptcy vigorously pursue a legal claim against the sometimes elusive bureaucracy? What precedential value would there be for defendants, and for the many others affected who await a decision, if this court should simply dismiss this suit in equity without prejudice by finding that an adequate remedy at law exists? If, under these circumstances, there is a remedy at

law, it is far from adequate. The merits of this controversy, then, must be addressed. Constitutional questions?

Defendants place most, if not all, of their emphasis on the existence of a national crisis which they say must be dealt with in a drastic, if somewhat unorthodox, fashion. This court takes judicial knowledge of the existence of the crisis. This court regularly and routinely deals with cases in which persons are charged with and convicted of drug offenses which curl the hair and which create fear and apprehension in the community. The court does not quarrel with the executive branch, or with any of these defendants, over the correctness of their conclusion that there is a desperate need to solve an out-of-control problem of monumental proportions. The question here, however, is not whether a major problem exists, justifying the creation of a "drug czar" with special powers, but whether innovative executive actions to eradicate the drug problem can include the action which was here taken by these defendants and which is here under judicial scrutiny.

At an earlier time of national crisis surpassing, or at least equalling in its potential for catastophe, the drug war of today, Abraham Lincoln, with Congressional blessing, purported to suspend habeas corpus in certain non-seceding States. This was done in the name of an absolute, wartime necessity. President Lincoln was overruled posthumously in *Ex Parte Milligan*, 4 Wall. 2, 71 U.S. 2, 18 L.Ed. 281 (1886). Although there Congress had purported to authorize the President to suspend the writ, when the case finally reached the Supreme Court, that Court said, *inter alia:*

> ... it is insisted that the safety of the country ... demands that this broad claim for martial law shall be sustained. If this were true, it could be well said that a country, preserved at the sacrifice of all the cardinal principles of liberty, is not worth the cost of preservation.

4 Wall. at 126, 71 U.S. at 126.

In more recent times, the Supreme Court responded more favorably to an executive request for extraordinary powers in a crisis situation in *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). Speaking through Justice Black, a true civil libertarian for whom the very courthouse in which this court sits is named, the Supreme Court found a way temporarily to uphold the horrible treatment accorded Japanese–American citizens during the Second World War. A Congress, which even now anguishes over what to do about assault rifles, in fear that they will be used in a drug war akin to a "civil war" or to a "world war," is now breaking the budget to find the funds to compensate only partially for the constitutionally unjustifiable injury perpetrated upon citizens of Japanese ancestry occasioned by fear and overreaction in 1941–42. The point, of course, is that the existence of a crisis can rarely, if ever, justify unconstitutional acts or the misconstruction of a statute. Justices Roberts, Murphy and Jackson strongly dissented in *Korematsu.* Justice Jackson said:

> ... if we cannot confine military expedients by the Constitution, neither would I distort the Constitution to approve all that the military may deem expedient.... I cannot say, from any evidence before me, that the orders of General DeWitt were not reasonably expedient military precautions, nor could I say that they were. But even if they were permissible military procedures, I deny that it follows that they are constitutional.
>
> \* \* \* \* \* \*
>
> I should hold that a civil court cannot be made to enforce an order which violates constitutional limitations even if it is a reasonable exercise of military authority. The courts can exercise only the judicial power, can apply only law, and must abide by the Constitution, or they cease to be civil courts and become instruments of military policy.

323 U.S. at 244, 245, 247, 65 S.Ct. at 207, 207, 208.

The publicity surrounding the present ban on the importation of guns, even though the ban may be only "temporary" like the Japanese–American internment in *Kore-*

# 1062

*matsu,* makes it appear that the office held by Director Bennett is a quasi-military office preparing to do battle. War has been declared on drugs, making Justice Jackson's comments most apropos. This court cannot say that Director Bennett's order is not reasonably expedient and might not contribute in some way to the winning of the war. Neither can this court say otherwise. But is it constitutional?

The question, then, in this case is this: Is the joint action which was here taken by the Director Bennett, the Secretary, the ATF and the Customs Service unconstitutional or otherwise unlawful? Gun South argues that the ban, which took place without any notice or any pre-determination hearing procedures, and which, in fact, even now provides for no post-determination hearing, violates procedural "due process." Probably true! Gun South further argues that the action which initially allowed functionally equivalent foreign weapons to be imported while Steyr AUG's were interdicted, without the slightest excuse being offered for the difference in treatment, violates "equal protection." Although the Fifth Amendment does not contain the words "equal protection," its "due process" clause has been construed so as to embrace "equal protection," and this moratorium, as initially ordered, contains no rational distinction between guns and thus probably did violate "equal protection." Whether the later addition of all remaining foreign assault rifles to the list of banned weapons provides a defense to the "equal protection" argument is a good question. In the context of a "war on drugs," is a distinction between foreign guns and identical domestic guns rational? In some other context, such as protecting domestic industry, perhaps! Gun South next argues that the interference with its formal permits, with its contracts, and with its personal property, constitutes a taking of property for public use without the payment of "just compensation," prohibited by the Fifth Amendment. Gun South is probably correct! Gun South next argues that the government was estopped from rescinding its permit once the permit was acted upon to Gun South's detriment. Although

there is a narrow spectrum of cases in which estoppel is available against the government, this case is probably not within that spectrum, even though the Eleventh Circuit in *State of Alabama v. United States Environmental Protection Agency,* 871 F.2d 1548 (11th Cir.1989), mentioned the fact in passing that the State of Alabama formally granted its written permission to a waste management company to ship toxic wastes into Alabama. The Eleventh Circuit then vacated the district court's injunction against the importation of toxic waste into Alabama. Although estoppel is probably not efficacious against the United States, Gun South's permit, once acted upon, did create a valuable property right which cannot be simply taken from Gun South in an exercise of "police power," that is, without fairly compensating Gun South. There is no evidence that the government has offered Gun South $700,000 or any other sum. Gun South next argues that the action of defendants is "arbitrary and capricious" and thus violates substantive "due process." This is a good argument, although it requires this court to say that it need not agree or disagree with *Gilbert Equipment Company v. Higgins,* 709 F.Supp. 1071 (S.D.Ala. 1989), relied upon by defendants, inasmuch as that case is distinguishable on its facts. There are other crucial distinctions, but it is enough that *Gilbert Equipment* involved not the interruption of a transaction being undertaken under a valid existing permit but rather the denial of an application for a permit for a *shotgun.* In *Gilbert Equipment,* Mr. Owen, the same ATF technician who approved the Steyr AUG for importation, made a different factual determination prior to any importation, based on the shotgun's "weight, size, bulk, designed capacity, configuration and other factors" and found it "not particularly suitable for or readily adaptable to a sporting purpose." 709 F.Supp. at 1074. Wisely, Gun South does not insert or insinuate into its argument the Second Amendment's "right to keep and bear arms," a constitutional issue which some of the media commentators erroneously find lurking in the case.

Rules of construction.

There are several jurisprudential principles which persuade this court not to attempt a definitive answer to all or any of the questions posed and casually treated in the lengthy paragraph just above.

■ First, a constitutional question should never be decided if the controversy being litigated can be resolved by deciding a dispositive question which does not implicate the Constitution. This rule finds its best expression in the concurrence by Justice Brandeis in *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936), as follows:

> The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.

297 U.S. at 347, 56 S.Ct. at 483 (citations omitted).

The other rules which control this case are rules of statutory construction, because this controversy can be decided simply by ascertaining the Congressional intent in 18 U.S.C. § 925.

The first and last rule of statutory construction here controlling is this: Where there is no ambiguity in a statute, the statutory language itself controls. *Train v. Colorado Public Interest Research Group, Inc.*, 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976). This court finds no ambiguity in § 925(d)(3). The statute notably does not contain the word "may." It uses the mandatory word "shall." It says:

> (d) The Secretary *shall* authorize a firearm ... to be imported or brought into the United States or any possession thereof if the firearm ...

> \*    \*    \*    \*    \*    \*

> (3) ... is *generally recognized as particularly suitable for or readily adaptable to sporting purposes.*

(emphasis supplied).

These defendants have offered no evidence whatsoever to indicate that the Steyr AUG is not "generally recognized as particularly suitable or readily adaptable to sporting purposes." To the contrary, *all* of the evidence in this case demonstrates that the Steyr AUG is designed and marketed to be predominantly a sporting weapon. For aught appearing, it has never been used deliberately to harm a human being in the United States. Director Bennett's emergency interdiction cannot change this fact. Neither can it change the meaning of the word "shall."

Article I of the Constitution places on *Congress* the responsibility for setting public policy in this country. The President and his executive department have only a limited public policy role. The Judiciary, theoretically at least, has no policy role whatsoever. The courts are simply an instrumentality for interpreting and implementing the Constitution and Congressional enactments. Congress can, of course, acting pursuant to the "commerce clause," prohibit the importation of almost anything, including firearms. Congress admittedly can delegate areas of power over foreign commerce to the President. *See Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed.2d 568 (1948). In *Century Arms, Inc. v. Kennedy*, 323 F.Supp. 1002 (D.Vt. 1971), *aff'd*, 449 F.2d 1306 (2d Cir.1971), *cert. denied*, 405 U.S. 1065, 92 S.Ct. 1494, 31 L.Ed.2d 794 (1972), a district court found that the Gun Control Act of 1968 did not deprive a gun importer of "due process" when the Secretary of Treasury exercised his discretion to deny a license. This fact situation is readily distinguishable from the present fact situation in which a specific permit already issued to a duly licensed gun dealer, was rescinded or interfered with. Furthermore, *Century Arms* was decided at a time when 18 U.S.C. § 925(d)(3) read quite differently from the way it reads today. It then read:

(d) ... the Secretary *may* authorize a firearm to be imported or brought into the United States or any possession thereof if the person importing or bringing in the firearm *establishes to the satisfaction of the Secretary* that the firearm ...

\* \* \* \* \* \*

(3) is of a type that ... is generally recognized as particularly suitable for or readily adaptable to sporting purposes....

(emphasis supplied).

The key changes made in this statute between the deciding of *Century Arms* and the appearance of the problem encountered by Gun South, are obvious. They lead to a consideration of the second rule of statutory construction which is probably unnecessary in light of the unequivocal language of the present statute, but which adds to the persuasive effect here. The amendment came in 1986 in the Firearms Owners' Protection Act of 1986. A helpful principle of statutory construction is to look at the legislative history. The House Judiciary Committee criticized the Senate bill's proposed language, as finally enacted, by saying:

### Liberalizing the Importation of Firearms

Opens up the importation of firearms by mandating the Secretary to authorize importation of a firearm if there is a sporting purpose and eliminating the requirement that the importer has the burden of satisfying the Secretary of the sporting purpose....

H.R. No. 495, 99th Cong., 2d Sess. 14 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin.News 1327, 1340.

The Senate had its way, and the amendment to § 925(d)(3), as adopted, was elucidated by the Senate Judiciary Committee as follows:

Under that Section [925(d)(3) before the amendment], the Secretary may authorize importation of specified firearms or ammunition.... The Committee amendment *requires* the Secretary to authorize

the importation of firearms in the listed categories.

Federal Firearms Owners' Protection Act: Report of the Senate Judiciary Committee, 98th Cong., 2d Sess. 27 (1984) (emphasis supplied).

Defendants here ask this court to ignore a clear Congressional message delivered as recently as 1986. If Congress now wants to send a different message to the gun world, the message will have to come from Congress and not from Director Bennett, or from this court, or from other cognoscenti.

■ A third rule of construction, perhaps unnecessary but nevertheless here applicable, calls for the strict construction of a statute if a liberal construction would act in derogation of a common law right or would implicate or call into question a constitutional right. This principle is so elementary as to require no citation of authority. In this case, the construction which defendants seek would not only interfere with Gun South's common law right of contract but would trigger a laundry list of constitutional questions which other gun importers, perhaps with different fact situations, probably would like answered but which are not necessary to this decision.

■ Because the statute here being construed contains a criminal penalty provision, the statute *must* be strictly construed in favor of the potential violator under the well-recognized "rule of lenity." Although like the other rules of construction this rule does not come into play where there is no ambiguity in the statute, it is used to resolve in favor of the potentially accused, any dispute over meaning. *Bifulco v. United States,* 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980).

The last guide this court will discuss as a possible aid to the interpretation of this particular statute is found in the canon which gives deference to prior executive or administrative interpretation. Again, this rule is applicable only where there is ambiguity. But assuming *arguendo* that there was room for more than one reading of § 925(d)(3) after the 1986 amendment, the contemporaneous and subsequent practice

by ATF illustrating its understanding of the statute is unambiguous. It loudly teaches that the Steyr AUG meets the statutory criteria for an importable sporting weapon. *United States v. Cooper Corp.*, 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (1941), in which the Supreme Court held that the construction placed on a law by the officers of a government department charged with executing that particular law is a valid indicator of Congressional intent, would lose all meaning if the rule were not applied here. The statute here being interpreted did not change with Director Bennett's announcement. The weapon was previously designated as complying with the unchanged statute. The weapon has not changed! The only thing that has changed is an administration in Washington and perhaps the perception of the proportion of the drug and gun crisis. Not only did Gun South obtain a favorable administrative determination *before* it ordered its first Steyr rifle, but even after these particular weapons were in shipment, Gun South was advised by ATF that its outstanding permits were good. The administrative advice which Gun South received was reasonable, was consistent with the importation statute and with the Constitution, and comported with fundamental fairness. Gun South had no reason not to give the administrative determination the deference it was due, and neither does this court.

Conclusion.

Gun South will be irreparably injured if defendants are not ordered to release Gun South's weapons for immediate delivery. And if Gun South has any legal remedy, it is woefully inadequate.

What Congress is hustling to consider at this very moment might suggest that Congress will retreat from the clear intent it manifested as recently as 1986. It has that right! At all times Congress has made it clear that *it* is the policymaker in this area. It has not authorized ATF, or any other executive agency, to legislate or, for that matter, to do anything administratively to "hold things in the road" on an interim basis until Congress can make up its mind on what to do. Neither this court nor Director Higgins has any power to instruct Congress to solve a perceived problem within 90 days or, for that matter, to instruct Congress that there is a problem which needs solving. Congress has already seen fit by adopting Title VII of the Anti–Drug Abuse Act of 1988 to create a federal death penalty for persons who commit drug-related killings with guns. This was enacted by *Congress* before there was a "drug czar." If Congress decides to enact a statutory embargo or a protective tariff on imported rifles, such a statute would constitute an act of protectionism, even if that were not its articulated purpose, but it would be a *Congressional* expression of policy, like its new death penalty. It would not be an *ad hoc* executive response to a problem.

For the foregoing reasons, the court narrowly decides that 18 U.S.C. § 925(d)(3) precludes defendants' interdiction of plaintiff's rifles purchased under permits validly issued and valid when acted upon. *Inter alia*, this court was designed by Congress and by the Constitution to come to the aid of the irreparably injured by the granting of extraordinary relief if the injury is occasioned by an illegal act and if there is no adequate remedy at law. Fully recognizing that there are many sides to the larger policy questions inherent in this fact situation, Gun South is due injunctive relief while the broader national debate continues to rage.

By separate order, the court will deny defendants' motion for summary judgment and will grant plaintiff relief in the form of a mandatory injunction requiring the release by the Customs Service to plaintiff of the weapons presently held at the Birmingham airport.